UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                   Case No. 16-cr-20263

v.                                      Honorable Thomas L. Ludington

ROBERT L. SAMP,

        Defendant.

_____/

**ORDER DENYING MOTION FOR INJUNCTIVE RELIEF**

On April 14, 2016, Defendant Robert L. Samp was indicted on three counts of willfully failing to prepare and file an income tax return. On August 10, 2016, the Court granted Samp's motion to substitute retained attorneys for his appointed counsel. On the same day, the Government issued a superseding indictment which charged Samp with the additional offense of possessing a firearm while being an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). ECF No. 20.

Several months later, Samp filed a motion for injunctive relief. ECF No. 30. In the motion, Samp challenges the Government's authority to prosecute Count Four of the superseding indictment. That count asserts that Samp, "then being an unlawful user of a controlled substance, knowingly possessed a firearm, in and affecting commerce, in violation of 18 U.S.C. § 922(g)(3)." ECF Nos. 20, 47. In support of his motion for injunctive relief, Samp relies upon *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016), where the Ninth Circuit concluded that a provision in a federal appropriations bill barred federal prosecutors from charging defendants with crimes for actions undertaken in full compliance with state medical marijuana laws. On

December 13, 2016, the Court issued an order addressing Samp's motion for injunctive relief which reasoned, in relevant part:

> In *McIntosh*, . . . [t]he appellants based their argument on the following rider which Congress included in an omnibus appropriations bill:
>
>> None of the funds made available in this Act to the Department of Justice may be used, with respect to the States of Alabama, Alaska, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, and Wisconsin, to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.
>
> Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113–235, § 538, 128 Stat. 2130, 2217 (2014).
>
> An essentially identical rider was included in the appropriations act for the fiscal year ending September 30, 2016. Consolidated Appropriations Act, 2016, Pub. L. No. 114–113, § 542, 129 Stat. 2242, 2332–33 (2015).
>
> . . . The *McIntosh* Court concluded that, "at a minimum, § 542 prohibits DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." *Id.* at 1177. However, the court also found that the statutory language does not prevent the DOJ from prosecuting "individuals who engage in conduct unauthorized under state medical marijuana laws." *Id.* at 1178.
>
> The *McIntosh* Court chose to "leave to the district courts . . . the precise remedy that would be appropriate" for violations of § 542. *Id.* at 1179. However, the court did hold that: "If DOJ wishes to continue these prosecutions, Appellants are entitled to evidentiary hearings to determine whether their conduct was completely authorized by state law, by which we mean that they strictly complied with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." *Id.*
>
> . . . The language of § 542 clearly prohibits the DOJ from expending funds to prevent Michigan from implementing its own state law regarding the use, distribution, possession, and cultivation of medical marijuana. Here, Count Four is charging Samp with possession of firearms in connection with his medical marijuana business. The Government has not alleged that Samp's possession of the firearms was unlawful apart from his medical marijuana business. Although

- 2 -

>the Government is not attempting to directly prosecute Samp for his medical marijuana business, which would be in direct violation of § 542, Count Four accomplishes materially the same effect. Accordingly, if Samp fully complied with the Michigan medical marijuana law, then the Government's prosecution of Count Four is in violation of § 542.
>
>To answer the question of whether Samp was complying with the Michigan medical marijuana law, an evidentiary hearing is necessary. The remaining issue is which party bears the burden of proof at the hearing. . . . It is axiomatic that criminal defendants are innocent until proven guilty and that the Government bears the burden of demonstrating their guilt. *See In re Winship*, 397 U.S. 358, 362 (1970). As such, the presumption must be that Samp has complied with the Michigan medical marijuana law. If the Government can prove, by a preponderance of the evidence, that Samp was not in full compliance with the Michigan medical marijuana law, then the Government will be allowed to continue prosecuting Count Four.

After three days of hearings on Samp's pending motion to enjoin the Government from prosecuting Count Four of the indictment, ECF No. 30, the Court directed the parties to submit supplemental briefing on several issues related to the provisions of the Michigan Medical Marijuana Act (MMMA) as they existed during the relevant timeframe. ECF No. 50. The Court also directed the Government to submit relevant law enforcement investigative reports. For the reasons stated below, the motion for injunctive relief will be denied.

**I.**

**A.**

On the first day of the evidentiary hearing, Detective-Sergeant Robert "Mike" Hahn testified regarding the search of Samp's residence from which the current charges stem. At the time, Hahn was a member of the Huron Undercover Narcotics Team ("HUNT"). He testified that Samp first came to HUNT's attention after the DEA intercepted a Fed-Ex package which contained marijuana. After investigating the source of the package, HUNT obtained a warrant to search Samp's residence and several medical marijuana dispensaries he operated. On September

21, 2011, more than four years before the indictment would be returned, HUNT executed the warrant and searched Samp's residence.

According to Hahn, the search of the residence, dispensaries, and marijuana grow locations revealed Samp "to be in gross violation of almost every provision of Michigan's Medical Marijuana Act." Supp. Rep. 0001 at 1–2, ECF No. 55, Ex. 15. Hahn's testimony at the hearing relied heavily upon the incident reports he prepared subsequent to the search. *See* Supp. Rep. 0002, ECF No. 55, Ex. 10. In the report, Hahn listed over fifteen different containers seized from the Samp residence which included confirmed or suspected marijuana. *See id.* at 1–8. In total (and including the weight of the original packaging), those containers weighed approximately 667.5 grams. Although much of the marijuana was seized from a closet connected to the master bedroom in Samp's residence, a significant amount of marijuana was seized from the nightstand and dresser in the master bedroom, as well as the master bathroom vanity. Among the items seized were smoked marijuana cigarettes and paraphernalia used to smoke marijuana.

HUNT officers also seized a number of "edibles": food products which were suspected or confirmed to contain marijuana. In this case, the edibles included brownies, rice crispy treats, fruity pebble snacks, butter, cakes, cookies, chocolate, and suckers. Together, the edibles (including in some cases the weight of the original packaging) weighed approximately 4,879.5 grams. The searches of Samp's dispensaries revealed hundreds (if not thousands) more grams of suspected or confirmed marijuana and marijuana edibles.

After the first day of the evidentiary hearing, the Government tested and weighed some of the substances seized from Samp's residence, dispensaries, and grow farms. *See* Lap Rep. I and Lab Rep. II, ECF Nos. 55, Ex. 16, 17. The laboratory tested representative portions of the seized items. For example, the lab tested one of the 170 smoked cigarette butts which were

seized. Lap Rep. I at 1. Every item the laboratory analyzed tested positive for marijuana or delta-1-tetrahydrocannibol, a component of marijuana. The weight of the items actually tested by the lab totaled approximately 301.59 grams. The laboratory also weighed the remaining items, which had not been individually tested. Those items weighed another 330.72 grams. Together, then, the weight of the tested samples and remaining portions of the sent to the lab totaled 632.31 grams items (excluding the weight of the original packaging).

When Samp's dispensary was searched, HUNT officers searched Samp's truck. Inside, officers found a baggie with usable marijuana and several jelly jars containing usable marijuana. Hahn provides an approximate weight of 129.08 grams of marijuana for those items, excluding the packaging in which they were found. *See* Hahn Aff. at 6, ECF No. 55, Ex. 18.

HUNT officers also located several locations where Samp was growing marijuana plants. At one location, officers found 7 large plants, plus a number of small "clones" that did not have root structure. Supp. Rep. 0001 at 6–7. At another location, officers found another 53 marijuana plants with substantial root structure. Officers also found 44 small plants that had some root structure.

**B.**

On the second day of the evidentiary hearing, Robert Samp's wife, Sandra Samp, testified. Evid. Tr. II, ECF No. 56. She explained that, at the time of the search, she was the holder of a Michigan Medical Marijuana card. *Id.* at 16. According to Ms. Samp, she continues to smoke medical marijuana approximately once a day. *Id.* at 18. She further testified that, at the time of the search, Robert Samp also held a card which authorized him to use medical marijuana for personal use. *Id.* Ms. Samp testified that her daughter, Chelsea Samp, lived in the house and possessed a medical marijuana card at the time of the search. Ms. Samp acknowledged that, in

the past, she and Mr. Samp both smoked marijuana. Although she usually smoked outdoors, sometimes she would smoke inside the house. *Id.* at 29–30. Ms. Samp flatly denies that Mr. Samp smoked marijuana in the house ever, and she asserts that he did not smoke marijuana at all until after the warrant was executed. *Id.* at 50.

According to Ms. Samp, she kept her marijuana in the master bedroom closet. *Id.* at 39. She testified: "typically, the product in the bin [identified elsewhere as a red tote] was for the patients, and then I had mine in a separate lockbox in the closet is how it would, but I don't want to say that I never got in the bin and took marijuana and used it. . . ." *Id.* at 41. When shown pictures of the marijuana and paraphernalia which HUNT officers purportedly found on the master bedroom dresser, Ms. Samp indicated she did not know what it was. *Id.* at 82. According to her, "[n]othing was ever really on the dresser." *Id.*

## II.

In the November 2008 election, Michigan voters approved by a large margin an initiative which authorized the use of marijuana to treat certain medical conditions. The Michigan legislature then crafted a statute implementing the will of the voters. The resulting law is the Michigan Medical Marihuana Act. The "MMMA does *not* create a general right for individuals to use and possess marijuana in Michigan." *People v. Kolanek*, 491 Mich. 382, 394 (2012) (emphasis in original). The *Kolanek* Court emphasized that "[p]ossession, manufacture, and delivery of marijuana remain punishable offenses under Michigan law." *Id.* Accordingly, the "MMMA's protections are limited" to individuals whose use "'is carried out in accordance with the provisions of'" the Act. *Id.* (quoting Mich. Comp. L § 333.26427(a)). Rather than decriminalizing the possession and use of marijuana, the MMMA provides an affirmative defense to state prosecutions related to marijuana use, possession, and distribution for four

categories of individuals: qualifying patients, registered primary caregivers, physicians, and other specified persons. *See* Mich. Comp. L. 333.26424(a), (b), (f), (g), & (i). To the extent a qualifying patient or caregiver possesses marijuana in connection with the medical use of marijuana, they cannot be arrested or prosecuted for violation of state law. *Id.* at (a) & (b).

Similarly, the MMMA has no effect on the illegality of possession and use of marijuana under federal law, including charges for possessing a firearm while being an unlawful user of marijuana. In *United States v. Bellamy*, the defendant challenged his conviction for violating 18 U.S.C. § 922(g)(3), claiming that he was not an "unlawful user" of a controlled substance because his use was in compliance with the MMMA. No. 16-1752, 2017 WL 1032313, at *3 (6th Cir. Mar. 16, 2017). The Sixth Circuit rejected that argument as "contrary to federal law." Under current federal law, marijuana is a controlled substance and thus no physician may prescribe it and no individual can use it without violating federal law.

As explained in the December 13, 2016, order, Congress included a rider in the omnibus appropriations bill which forbids the Department of Justice from preventing states with medical marijuana laws from "implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act, 2016, Pub. L. No. 114–113, § 542, 129 Stat. 2242, 2332–33 (2015). In *United States v. McIntosh*, the Ninth Circuit construed that language as prohibiting the Department of Justice from "spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." 833 F.3d 1163, 1177 (9th Cir. 2016). The rider did not decriminalize possession and use of medical marijuana under state law; it simply prohibited the Department of Justice from expending funds in prosecuting violations of federal drug law if the marijuana use and possession fully complied

with a state medical marijuana law. The *McIntosh* Court further explained that the rider prohibits only prosecutions of individual whose "conduct was *completely authorized* by state law, by which we mean that [he] *strictly complied* with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." *Id.* at 1179 (emphasis added). Importantly, the question is not, contrary to Samp's repeated arguments, whether Samp was an "unlawful user" of marijuana as defined in § 922(g)(3). If Samp is not entitled to an injunction, that question will be decided by a jury. Compliance with the MMMA is not an affirmative defense to § 922(g)(3). The narrow issue currently before the Court is only whether Samp strictly complied with the MMMA.

Samp also argues that his possession of marijuana as a caregiver under the MMMA is irrelevant to the present prosecution. He asserts that the inquiry should be limited to whether he was in noncompliance with the MMMA's provisions regarding personal use. That argument might have force if Samp could reasonably argue that he did not use marijuana or if he maintained his marijuana inventory for personal use separate from his inventory for the medical marijuana dispensary. But the evidence presented at the evidentiary hearing makes either assertion untenable. Rather, the evidence demonstrates that Samp was not in compliance with either the MMMA's use or caregiver provisions. The *McIntosh* Court emphasized that § 542 only prohibits expenditure of funds to prosecute individuals whose conduct was "completely authorized" by state law, meaning that the individuals "strictly complied with all relevant conditions imposed by state law." *Id.* As explained below, Samp did not.

On the other hand, the Government argues that Samp cannot defend against Count Four by asserting that his use was lawful under Michigan law. In support, the Government cites *United States v. Bellamy*, No. 16-1752, 2017 WL 1032313 (6th Cir. Mar. 16, 2017), described

above. The Government asserts here that "[i]f there was merit to the notion that § 542 precluded prosecutions under 18 U.S.C. § 922(g)(3), the Sixth Circuit could have taken note of that fact and invalidated the conviction in that case." Gov't Supp. Br. at 3. This argument is premised on the same misunderstanding which underlies Samp's argument, rejected above. Even if Samp was in full compliance with every provision of the MMMA, that would not operate as a defense to Count Four. On the contrary, the question presented is whether the DOJ is authorized by Congress to expend funds prosecuting this count, not whether Samp has violated 18 U.S.C. § 922(g)(3). The *Bellamy* Court rejected the defendant's sufficiency of the evidence defense (advanced after conviction) by correctly pointing out that his conduct was illegal under federal law, regardless of whether it was legal under state law. The applicability of § 542 was neither argued by the parties nor addressed by the Sixth Circuit in *Bellamy*. Given the different procedural and legal postures of the two cases, *Bellamy* is of limited relevance to the present motion.

Finally, the Government argues that this Court does not have the authority to enjoin the prosecution regardless of whether § 542 was violated. As the *McIntosh* Court explained, injunctive relief is a generally inappropriate remedy in federal criminal proceedings. *See McIntosh*, 833 F.3d at 1172. But the Ninth Circuit expressly found that it was appropriate in the § 542 context:

> Here, however, Congress has enacted an appropriations rider that specifically restricts DOJ from spending money to pursue certain activities. It is "emphatically ... the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for ... the courts to enforce them when enforcement is sought." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *accord United States v. Oakland Cannabis Buyers' Co–op.*, 532 U.S. 483, 497, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). A "court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed

> in legislation.' " *Oakland Cannabis*, 532 U.S. at 497, 121 S.Ct. 1711 (quoting *Virginian Ry. Co. v. Sys. Fed'n* No. 40, 300 U.S. 515, 551, 57 S.Ct. 592, 81 L.Ed. 789 (1937)). Even if Appellants cannot obtain injunctions of their prosecutions themselves, they can seek—and have sought—to enjoin DOJ from spending funds from the relevant appropriations acts on such prosecutions. When Congress has enacted a legislative restriction like § 542 that expressly prohibits DOJ from spending funds on certain actions, federal criminal defendants may seek to enjoin the expenditure of those funds, and we may exercise jurisdiction over a district court's direct denial of a request for such injunctive relief.

*Id.* at 1172–73.

The argument presented by the Government does not directly engage with the rationale provided by the Ninth Circuit.[1] Further, the Government did not raise this argument until after submitting two briefs and participating in three days of hearings. More importantly, the Government has not demonstrated that the Ninth Circuit's thoughtful analysis is contrary to Sixth Circuit or Supreme Court precedent. Given the significant time already invested in litigating this motion, and because Samp is not entitled to injunctive relief on the merits, the Court will follow the Ninth Circuit's analysis regarding authority to enjoin violations of § 542.

### III.

#### A.

As directed by the Court, the parties have summarized the provisions of the MMMA at the time the search occurred. At all times since the MMMA was passed, a "qualified patient" could possess 2.5 ounces of usable marijuana and 12 marijuana plants for personal use. Mich. Comp. L. 333.26424(a). Additionally, an individual can register as a primary caregiver, serving up to five patients. If serving as a caregiver, the individual can possess 2.5 ounces of usable marijuana and 12 marijuana plants per patient. *Id.* at 333.26424(b), (b)(1)–(2). At most, then, one

---

[1] The Government cites three cases in support of its argument: *Deaver v. Seymour*, 822 F.2d 66, 68–71 (D.C. Cir. 1987); *Kajtazi v. Johnson-Skinner*, 2017 WL 436038, *2 (S.D.N.Y. Jan. 30, 2017); and *Dostal v. Stokes*, 430 F.2d 1299, 1300 (6th Cir. 1970). Each of those cases dealt with an attempt to enjoin a criminal prosecution in a separate civil lawsuit. Here, Samp is seeking to enforce *in the criminal proceeding itself* a deliberately-expressed legislative provision which, if applicable, would prohibit the Government from expending funds to prosecute Count Four.

individual with a patient card *and* a caregiver card could possess 2.5 ounces of marijuana for personal use and an additional 12.5 ounces of marijuana for patients. Fifteen ounces is equivalent to approximately 425.24 grams. The maximum amount of marijuana plants an individual can possess is 72.

At the time of the search, the MMMA was silent on the question of whether marijuana-infused edibles were legal. The statute defined "usable marihuana" as "the dried leaves and flowers of the marihuana plant, and any mixture or preparation thereof, but does not include the seeds, stalks, and roots of the plant." Mich. Comp. Laws Ann. § 333.26423 (as effective from December 4, 2008, to March 31, 2013). On July 11, 2013, the Michigan Court of Appeals held that marijuana-infused edibles which were prepared using portions of the plant other than the "dried leaves and flowers" were illegal under the MMMA. *People v. Carruthers*, 301 Mich. App. 590, 601 (2013). On December 20, 2016, the Michigan Legislature amended the MMMA to expressly legalize "marihuana-infused products." Mich. Comp. L § 333.26423(f). The amendment further explained that, for "purposes of determining usable marihuana equivalency," sixteen ounces of a solid marijuana-infused product is equivalent to one ounce of usable marijuana. § 333.25424(c)(1).

The MMMA has always required patients and caregivers to keep their growing marijuana plants in an "enclosed, locked facility." *Id.* at § 333.25424(a). On June 28, 2011, the Michigan Attorney General's office issued a written opinion stating that the MMMA "prohibits the joint cooperative cultivation or sharing of marihuana plants because each patient's plants must be grown and maintained in a separate enclosed, locked facility that is only accessible to the registered patient or the patient's registered primary caregiver." Opinion, ECF No. 55, Ex. 22. In reaching that opinion, the Attorney General explained that "[n]othing in the language of the

MMMA suggests that the majority of voters, in adopting the Act, intended that patients, primary caregivers, or any other individuals could form and operate cooperatives to jointly cultivate, store and share medical marihuana." *Id.* at 3. The opinion further explained that the MMMA clearly limited individuals to one primary caregiver and "does not authorize the patient to acquire marihuana from anyone else." *Id.* at 4.

Similarly, in *State v. McQueen*, 293 Mich. App. 644, 648 (2011), aff'd on other grounds, 493 Mich. 135, 828 N.W.2d 644 (2013), the Michigan Court of Appeals held that two men who owned a medical-marijuana dispensary where they sold marijuana could be prosecuted because they were in noncompliance with the MMMA. The *McQueen* Court rejected the argument that because members of the dispensary rented lockers and stored marijuana therein, marijuana was not possessed by the dispensary owners. Rather, the court explained that "[p]ossession may be actual or constructive, and may be joint or exclusive." *Id.* at 654. Because the defendants exercised "dominion and control over the marijuana," all the marijuana in the dispensary was ascribable to the defendants and "it could reasonably be inferred that defendants possessed more marijuana than allowed by the MMMA." *Id.* at 654, 665 n. 13.

**B.**

Although the evidence suggests that Samp was not complying with many provisions of the MMMA,[2] he was clearly not in compliance with the limits on possession of usable marijuana. Samp admits that the Michigan State Police testing (conducted in January 2017) revealed that 254.08 grams of uable marijuana was seized from Samp's home. Def. Supp. Br. at 4. The Government contends that Samp possessed 574.72 grams. Gov't Supp. Br. at 7. The Court's independent computation of the weighed marijuana comes to 632.31 grams (which includes a small amount of edibles). An exhaustive audit of the minor differences in these

---

[2] For example, Samp likely possessed more marijuana plants than permitted by the MMMA.

calculations is unnecessary because Samp is well over the 425.24 gram limit regardless of the calculation.[3] Samp reaches his lower number by including only the substances that were actually tested. But that approach is unreasonable. The Michigan State Police logically chose to test representative portions of some of the items seized. But one can reasonably infer that all items found in a single package are marijuana if a portion tests positive. Here, every portion of an item which the laboratory tested revealed marijuana. The logical conclusion is that the untested portions of the items also contained marijuana. The Government need only prove by a preponderance of the evidence that Samp was not in compliance with the statute. Given that burden of proof, the Government has established that the substances seized contained marijuana.

Even ignoring the usable marijuana seized from Samp's home, the marijuana-infused edibles found therein are sufficient, by themselves, to establish that Samp was not complying with the MMMA. First, the MMMA did not authorize possession or use of marijuana edibles at the time the search occurred. Samp tries to argue that the statute's silence should be construed in his favor. But, as the Supreme Court of Michigan has explained, the "MMMA does *not* create a general right for individuals to use and possess marijuana in Michigan." *People v. Kolanek*, 491 Mich. 382, 394 (2012) (emphasis in original). The *Kolanek* Court emphasized that "[p]ossession, manufacture, and delivery of marijuana remain punishable offenses under Michigan law." *Id.* Accordingly, the "MMMA's protections are limited" to individuals whose use "'is carried out in accordance with the provisions of'" the Act. *Id.* (quoting Mich. Comp. L § 333.26427(a)). Thus, to the extent that the MMMA did not unambiguously legalize edibles, Samp should have assumed that the background law which criminalized marijuana possession still applied. More importantly, the Michigan Court of Appeals held in 2013 that "the plain language of the

---

[3] It is unclear whether the calculations provided by Samp and the Government include the 129.08 grams of marijuana found in Samp's vehicle. The Court's calculation does not. If that additional 129.08 grams of usable marijuana is included, the total rises even further above the statutory limit.

MMMA" as it existed at the time of the search specified that "edible products made with THC extracted from marijuana resin are not usable marijuana under the MMMA." *Carruthers*, 301 Mich. App. at 603, 608.

Even if Samp were given the benefit of the doubt, however, the large amount of edibles seized from his home still establishes that he was not complying with the Act. The MMMA, as recently amended, allows possession of edibles and provides that sixteen ounces of edibles is equivalent to one ounce of usable marijuana. Mich Comp. L. § 333.26424(c). The edibles seized from Samp's residence (not including the many edibles seized from his dispensaries) weighed approximately 4,879.5 grams. Most of the edibles seized were weighed in their original packaging, so that number inflates the true weight of the edibles. But even if the number is reduced by twenty-percent to account for the packaging and then divided by sixteen, the total still comes to the equivalent of approximately 243.98 grams of usable marijuana. When that quantity is included with the 254.08 grams of usable marijuana which Samp admits was seized from his residence, the total weight is approximately 498.06 grams. Thus, even under the MMMA as it currently exists, Samp possessed more than fifteen ounces of usable marijuana.[4]

Even though Samp possessed more marijuana than the maximum permitted by state law, Samp could conceivably argue that he did not personally use marijuana and thus was only failing to comply with the caregiver provisions of the MMMA. But the Government has proved by a preponderance of the evidence that Samp personally used marijuana. First, Samp applied for and received a medical marijuana user card well in advance of the search. Second, significant amounts of marijuana were found in Samp's bedroom and bathroom (not just in the adjacent closet), including on the bedside nightstands. HUNT officers seized paraphernalia used to smoke

---

[4] The total of 498.0525 does not include the additional marijuana which was weighed but not actually tested by the lab or the marijuana seized from Samp's vehicle. As described above, an accurate tally would include those additional amounts.

marijuana from the bedroom. HUNT officers also seized smoked marijuana cigarettes from the bedroom, bedroom closet and Samp's vehicle. At the evidentiary hearing, Ms. Samp denied that Mr. Samp smoked marijuana prior to the search, that he ever smoked marijuana in the house, and that marijuana products were ever left on their dresser or nightstand. Because Ms. Samp's testimony was contradictory and belied by the physical evidence, her testimony is entitled to little weight. Even if believed, her testimony that she did not recognize the marijuana products (including the smoking paraphernalia) found in their bedroom suggests that Mr. Samp was responsible for those products. The fact that significant amounts of marijuana products (including smoked cigarettes and paraphernalia) were found in such close proximity to Samp's personal living space is compelling circumstantial evidence of Mr. Samp's personal use, especially considering his possession of a medical marijuana user card. The Government has carried its burden of demonstrating Samp's personal use of marijuana by a preponderance of the evidence.

Samp also argued that the marijuana found in his home can be attributed to his wife or daughter (who also possess user and caregiver cards), but that argument is without merit. As explained above, Michigan courts have construed "possession" under the MMMA as including joint or constructive possession. *McQueen*, 293 Mich. App. at 654. In other words, if Samp had dominion and control over the marijuana, it counts towards his limit under the MMMA. Given the fact that the marijuana was found throughout his bedroom, bedroom closet, and vehicle, Samp had dominion and control over all the marijuana seized, even if some of the inventory was meant for his wife's patients. Further, medical marijuana cooperatives or businesses were not clearly lawful at the time of the search. *See* Attorney General's Opinion Letter (summarized above); *McQueen*, 293 Mich. App. at 669. While the fact that Samp was not complying with that

portion of the MMMA is not directly relevant to Count Four of this prosecution, it does undercut his argument that the excess marijuana inventory in his residence should be attributed to his family members. Even if some of the marijuana seized could be proved to be owned by Samp's family members, it would not establish Samp's compliance with the statute.

More importantly, Samp made no attempt to keep his marijuana for personal use separate from the marijuana he sold. There was also no separation between his marijuana and his wife's marijuana. Rather, Samp stored his marijuana in the same cavalier manner with which he approached the remainder of the MMMA's restrictions. His behavior falls short of "strict compliance" with the statute.

To summarize, Samp possessed significantly more usable marijuana than permitted by the Michigan statute. He also possessed marijuana-infused edibles without regard to whether he was permitted to by the statute. The Government has proved by a preponderance of the evidence that Samp personally used marijuana and that he did so in noncompliance with the MMMA.

**IV.**

Accordingly, it is **ORDERED** that Defendant Samp's motion for injunctive relief, ECF No. 30, is **DENIED.**

Dated: March 29, 2017  s/Thomas L. Ludington
 THOMAS L. LUDINGTON
 United States District Judge

- 17 -

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 29, 2017.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager